**IN THE UNITED STATES DISTRICT COURT**
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | | |
|---|---|---|
| KRISTIE WHITEMAN RICKS, individually and as the Administratrix of the Estate of Brian Keith Ricks | * | |
| Plaintiff | * | |
| | * | NO: 4:08CV00345 SWW |
| VS. | * | |
| LARRY B. NORRIS, individually and in his capacity as the Director of the Arkansas Department of Correction, ET AL. | * | |
| Defendants | * | |

**MEMORANDUM OPINION AND ORDER**

Kristi Whitman Ricks filed this lawsuit pursuant to 42 U.S.C. § 1983 on behalf of the estate of Brian Keith Ricks against officers and officials of the Arkansas Department of Correction ("ADC"). Before the Court is Defendants' motion for summary judgment (docket entries #29, #30, #31) and Plaintiff's response in opposition (docket entries #33, #34, #35, #36, #37, #38, #39). After careful consideration, and for reasons that follow, summary judgment will be entered in Defendants' favor as to Plaintiff's claims brought pursuant to § 1983, and these claims will be dismissed with prejudice. Additionally, Plaintiff's supplemental claims brought pursuant to state law will be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

**I.**

On August 15, 2005, Brian Keith Ricks ("Ricks"), an inmate incarcerated among the general population of the ADC's East Arkansas Regional Unit ("EARU"), was stabbed to death by inmate Earnest Green, an inmate housed in cell block 4 of the EARU's maximum security unit. As part of his prison job, Ricks helped the issuance officer, Defendant T.E. Glasper, distribute items to maximum security inmates. According to the complaint allegations, on the day of Ricks' death, Glasper directed Ricks to deliver items to inmates without an escort, and when Ricks reached Green's cell, Green reached through the bars and plunged a shank into Ricks' neck. Prison medical personnel pronounced Ricks dead shortly thereafter.

Plaintiff brings this lawsuit on behalf of Ricks' estate, charging that Glasper and other ADC personnel violated Ricks' constitutional rights by failing to protect him from Green's attack. Plaintiff also brings a supplemental, wrongful death claim pursuant to state law. In addition to Glasper, Plaintiff sues (1) former ADC director, Larry Norris; (2) EARU warden, Greg Harmon; (3) EARU assistant warden, James Banks; (4) EARU chief of security, M.E. Williams; (5) EARU correctional officer Moses Jackson, III; and (5) EARU classification officer, Paulette Green. Each defendant is sued in his or her individual and official capacities. By way of relief, Plaintiff seeks compensatory and punitive damages.

According to the complaint allegations, Green repeatedly threatened Ricks and told him he would stab him to death, and Ricks repeatedly reported Green's threats to a prison employee named Ms. Stewart, who spoke to Green and confirmed that he had threatened to kill Ricks. Plaintiff alleges that Ms. Stewart notified Defendant Jackson about Green's threats and that Jackson placed Green on Ricks' enemy alert list, which was approved by Defendants Banks,

Harmon, and Williams. Plaintiff provides no specific dates regarding these events, alleging only that they occurred during the course of Ricks' incarceration.

Plaintiff claims that at the time of Ricks' demise, each defendant was aware that an enemy alert "had been filed regarding Brian Ricks and Earnest Green" and that Defendants knew, or should have known, about Green's propensity for violence. Plaintiff alleges, and information available on the ADC's public web site confirms, that when Green stabbed Ricks to death, his criminal record included convictions for first degree murder, attempted rape, battery, and possession of a weapon by an incarcerated person.

**II**.

Defendants move for summary judgment with respect to Plaintiff's claims pursuant to § 1983 on grounds that Plaintiff's official-capacity claims are barred under the doctrine of sovereign immunity and that each defendant is entitled to qualified immunity with respect to Plaintiff's individual-capacity claims.[1]

**Sovereign Immunity**

The sovereign immunity of the States recognized in the Eleventh Amendment[2] bars any

---

[1]Defendants also assert that Plaintiff has failed to establish that any defendant violated Ricks' constitutional rights–a question that must be considered in determining whether Defendants are entitled to qualified immunity.

[2]The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. The States' immunity from suit existed long before ratification of the Constitution, and it neither derives from or is limited by the Eleventh Amendment. *See Alden v. Maine*, 119 S. Ct. 2240, 2254 (1999).

suit brought in federal court against a state or state agency, regardless of the nature of the relief sought, unless Congress has abrogated the States' immunity or a state has consented to suit or waived its immunity. *See Seminole Tribe v. Florida*, 517 U.S. 44, 74 (1996); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *Edleman v. Jordan*, 415 U.S. 651, 663 (1974). The Arkansas Department of Correction is a state agency that is "the sole creation of the state" and has "no separate identity" from the state and cannot be stripped of its official character. *See Glick v. Henderson*, 855 F.2d 536, 540 (8th Cir.1988). Arkansas has not consented to suit in this case, and Congress did not abrogate the States' Eleventh Amendment immunity by enacting § 1983. *See Singletary v. Mo. Dep't of Corrs.*, 423 F.3d 886, 890 (8th Cir.2005); *Burk v. Beene*, 948 F.2d 489, 493 (8th Cir.1991). Accordingly, to the extent that Plaintiff brings claims against the ADC, they must be dismissed because the Eleventh Amendment bars suit against the agency.[1]

In addition to barring all claims brought directly against a state or state agency, the Eleventh Amendment protects state officials sued in their official capacities from all claims,[2] with the exception of certain claims for prospective, equitable relief. *See Murphy v. Arkansas*,

---

[1]Plaintiff argues that the estate's claims are permissible under *Monell v. Dept. of Social Services of New York*, 436 U.S. 658, 98 S.Ct. 2018 (1978). Plaintiff is mistaken. The holding in *Monell*--that local government units are persons subject to liability under § 1983, provided that such liability is based on the governmental unit's official policy–has nothing to do with sovereign immunity. In fact, the *Monell* Court noted that there is no constitutional impediment to municipal liability stating: "Our holding today is, of course, limited to local government units which are not considered part of the State for Eleventh Amendment purposes." *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036.

[2]An action against a government employee in his official capacity is another form of a claim against the employing government agency. *See Monell v. Dept. of Social Services*, 436 U.S. 658, 690 n.55, 98 S. Ct. 2018, 2035 n.55 (1978).

127 F.3d 750, 754 (8th Cir. 1997). In this case, however, Plaintiff seeks only money damages, thus the exception does not apply. In sum, the Court finds that Plaintiff's official capacity claims against Defendants are barred under the doctrine of sovereign immunity.

**Individual Capacity Claims - Qualified Immunity**

Qualified immunity shields government employees acting within the scope of their duties from suit for money damages so long as their conduct does not "violate clearly established statutory or constitutional rights of which a reasonable person would know." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Two questions guide the determination of whether a defendant is entitled to qualified immunity: (1) whether the plaintiff has shown the violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged misconduct. *See Pearson v. Callahan*, 555 U.S. —, 129 S. Ct. 808, 815-16 (2009)(noting the two-step inquiry for resolving qualified immunity claims mandated by *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151 (2001), and holding that courts may exercise sound discretion in deciding which of the two prongs should be addressed first).

The Court finds it appropriate in this case to start with the question of whether the facts asserted by Plaintiff that are properly supported by the record [3] show that a particular defendant's conduct violated a constitutional right. If that question is answered in the negative, the Court need not proceed further, as the defendant is entitled to qualified immunity. *See Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004).

Plaintiff claims that Defendants violated Ricks' rights granted under the Fourth, Fifth,

---

[3]Because the question of qualified immunity arises at the summary judgment stage in this case, the Court "must take as true those facts asserted by [the] plaintiff that are properly supported in the record." *Tlamka v. Serrell*, 244 F.3d 628, 632 (8th Cir. 2001).

Eighth, and Fourteenth Amendments; but the Court finds as a matter of law that the single, pertinent source of constitutional protection in this case is the Eighth Amendment's prohibition of cruel and unusual punishment,[4] which encompasses an inmate's right to be protected from harm by fellow inmates. *See Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970 (1994).

To prove an Eighth Amendment violation, a plaintiff must satisfy two requirements, one objective and one subjective. The first requirement tests whether, viewed objectively, the deprivation of rights was sufficiently serious. *See Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970 (1994). The second requirement is subjective and requires that the inmate prove that the prison officials had a sufficiently culpable state of mind—that they were "deliberately indifferent" to a serious risk of harm to the inmate. *See id.* With respect to the subjective component, a plaintiff must show that the defendant was aware of facts from which he could infer that a substantial risk of serious harm existed *and* that he actually drew that inference. *Farmer*, 511 U.S. at 837-38, 114 S. Ct. 1970. An official's failure to alleviate a significant risk that he should have perceived but did not does not violate the Eighth Amendment's proscription of cruel and unusual punishment. *See Farmer*, 511 U.S. at 838, 114 S. Ct. at 1979.

**1. Objective Component**. To meet the objective component of an Eighth Amendment, failure-to-protect claim, it must be shown that the inmate was incarcerated under conditions

---

[4]The Fourth Amendment's prohibition of unreasonable seizures of the person applies to excessive-force claims that arise in the context of an arrest of a free citizen, while the Eighth Amendment's ban on cruel and unusual punishment applies to excessive force or failure to protect claims by convicted criminals serving their sentences. *See Wilson v. Spain*, 209 F.3d 713. 175 (8th Cir. 2000)(quoting *Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865 (1989)). Additionally, because Plaintiff's claim is addressed by a specific constitutional provision–the Eighth Amendment's Cruel and Unusual Punishment Clause–it must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process. *See Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 1871 (1989).

posing a substantial risk of serious harm. *See Farmer*, 511 U.S. at 834, 114 S. Ct. at 1977(citing *Helling v. McKinney*, 509 U.S. 25, 35, 113 S. Ct. 2475, 2481 (1993)). Plaintiff argues that Ricks' job assignment, which required him to deliver items without an escort to an inmate who had been convicted of possessing a weapon in prison and who appeared on his enemy alert list, amounted to a prison condition that posed a substantial risk of serious harm.

Defendants appear to agree that assigning an inmate to deliver items to his enemy housed in the maximum security unit would present a substantial risk of serious harm to the inmate, but they contend that Ricks' job assignment actually disproves Plaintiff's claim that Green was on Ricks' enemy alert list. According to Defendants, once an enemy alert is entered in the prison's computer system, it can never be removed, and the computer system "will not allow you to assign an inmate to a job in an area in which he has an enemy." Def.'s Sum. Jmt. Br. at 10. Plaintiff, however, has produced a document titled "ENEMY ALERTS prepared by MAXIMUM SECURITY UNIT" dated August 21, 2005, eleven days after Ricks' death, which lists "Brian Ricks" under the heading "Earnest Green" and "Earnest Green" under the heading "Brian Ricks." Docket entry #36, Ex. #1. The Court finds that Green had a propensity for violence, that whether Green appeared on Ricks' enemy alert list at the time of the fatal attack is genuinely in dispute, and that Plaintiff has come forward with evidence demonstrating that Ricks was incarcerated under conditions posing a substantial risk of serious harm.

**2. Subjective Component**. The crucial question in this case is whether Defendants were deliberately indifferent to a substantial risk of harm to Ricks' safety---that is, whether Defendants were aware of a substantial risk of harm to Ricks and failed to take reasonable steps to avert such harm.

*A. Defendant Troy E. Glasper*. Plaintiff alleges that "upon information and belief" Glasper "knew or should have known about the enemy alert status of Ricks and Green" and that Glasper knew of Green's propensity for violence. Plaintiff further alleges that Glasper failed to follow a prison policy that required that he, not Ricks, personally hand out items to inmates and that he stay in proximity to Ricks.

Plaintiff presents the deposition testimony of Defendant Banks, who testifies that in his opinion, a correctional officer should personally hand items to inmates, and inmates assisting officers should perform tasks that do no involve direct contact with other inmates--such as pushing the cart, counting items to be distributed, and handing items to the officer. *See* Banks Dep. (docket entry #39, Attach. #1) at 23-25. Banks summed up his position as follows: "Hey, as a correctional officer, you do the job. The inmate is there to help you, not do your job." Banks Dep., at 29. Banks states that he is not aware of a "post order" that requires officers to stay in the presence of inmate assistants or to utilize them in the manner he describes, but he is reports that "it was preached to practice," and "it's almost one of those ongoing, recurring messages." Banks Dep., 23, 29.

By deposition, Glasper testifies that he had no knowledge that Ricks had an enemy in the maximum security unit and that pursuant to prison policy, if Green had been listed on Ricks' enemy alert list, he would not have been assisting in handing out items to inmates housed in the unit. *See* Glasper Dep. (docket entry #31, Ex. H) at 13-14. *Id*. at 20. Additionally, Glasper testifies that he had no conversations with Ricks regarding inmate Green, and he was not aware of a policy that required him to escort Ricks or precluded Ricks from delivering items to inmates. *See* Glasper Dep. at 14, 19. Glasper states that it was normal for him to be separated from Ricks

during issuance activities, and on the day of Ricks' death, Ricks was in a hurry to complete his duties because he was expecting a package from home. *See* Glasper Dep. at 19, 23. According to Glasper, after he, Ricks, and another issuance-duty inmate entered cell block 4, Ricks grabbed a delivery item and "went right away" to the second tier where Green was housed, while Glasper remained on the main floor "getting paperwork together." *See* Glasper Dep. at 25-26.

Even assuming that Glasper violated a prison policy that required officers to accompany inmate assistants and to personally issue items to inmates, that fact does not in itself demonstrate that Glasper had the requisite knowledge of a substantial risk to Ricks' life or safety. The record contains no evidence that Glasper was on fair notice that allowing Ricks to deliver items to other inmates would subject him to a threat of substantial harm at the hands of other inmates, and Glasper has provided undisputed evidence that he was unaware of a risk of harm to Ricks. Because Plaintiff fails to present sufficient evidence of the subjective component of his Eighth Amendment claim against Glasper, the Court finds that Glasper is entitled to qualified immunity.

*B. Defendant Paulette Green*. Defendant Green served as the EARU issuance officer immediately before Glasper took the position. Plaintiff alleges that Green violated Ricks' constitutional rights by failing to properly train Glasper. Additionally, in her brief in opposition to summary judgment, Plaintiff asserts that Green "continued to allow Ricks to serve in [his position issuing items to maximum security inmates] after [she became] a classification officer even though Ricks and Green were on each others enemy alert list." Docket entry #35, at 8.

It is undisputed Green had been serving as a classification officer for several months prior to Ricks' death and that she had no role in training or supervising Glasper. *See* Defs.' St.

Facts, docket entry #31, ¶54;[5] *see also* Glasper Dep. at 38; Accordingly, the Court finds that Plaintiff cannot prevail under a failure-to-train theory. Furthermore, Plaintiff presents no evidence that Defendant Green was aware that inmate Green appeared on Ricks' enemy alert list or that she had any role in assigning Ricks to work as an issuance assistant. Although Plaintiff is entitled to all reasonable inferences, a reasonable juror would have to resort to speculation in order to find that Defendant Green was aware of a substantial risk to Ricks' safety and failed to respond in a reasonable manner. The Court finds that Green is entitled to qualified immunity.

*C. Defendant Moses Jackson, III.* In support of her claim against Defendant Jackson, Plaintiff alleges that he "assigned . . . Ricks to work in the Maximum Security Unit 4 where Earnest Green was housed in spite of his knowledge of the Enemy Alert Status and his prior knowledge of Green's animosity towards . . . Ricks." Compl. ¶39. However, it is undisputed that Defendant Jackson was on active military duty from October 2004 until January 2006, that Ricks was assigned the issuance-assistant job on April 25, 2005, and that Green stabbed Ricks to death on August 15, 2005. The record is void of any evidence that Jackson had any knowledge that Ricks was assigned work as an issuance assistant in the area where Green was housed or that Jackson, who was not physically present at the ADC when Ricks received his job assignment, could have taken action to protect Ricks.[6] The Court finds that Jackson is entitled to qualified

[5]Local Rule 56.1 provides that a party moving for summary judgment must submit a statement of the material facts as to which it contends there is no genuine issue to be tried, and the non-moving party must file a responsive statement of the material facts as to which it contends a genuine issue exists to be tried. "All material facts set forth in the statement filed by the moving party . . . shall be deemed admitted unless controverted by the statement filed by the non-moving party . . . . " Local Rule 56.1(c).

[6]In fact, Plaintiff alleges that when Jackson was present at the EARU, he placed Green on Ricks' enemy alert list.

immunity.

*D. Defendants M.E. Williams, James Banks, Greg Harmon, and Larry Norris*

Plaintiff brings her claims against Williams, Banks, Harmon, and Norris (hereinafter referred to collectively as "the separate defendants") based on a theory that they failed to carry out their supervisory or policy-making roles--specifically, that they failed to adequately train and supervise prison staff and failed to issue policies and procedures aimed at protecting inmates from physical attack by other inmates. In support of her claims against the separate defendants, Plaintiff refers to Banks' testimony regarding a "policy" requiring that correctional officers, not inmates, issue items to inmates. Plaintiff argues:

> Those defendants in supervisory capacities did not even know if the policy was written or not; it was just randomly discussed at security meetings and there was no procedure in place to make sure that this policy was passed along to the correctional officers.

Docket entry #35, at 9. Plaintiff presents evidence that before Ricks' death, ADC provided initial training for new officers but offered no additional training for issuance officers assigned to work in administrative segregation or the maximum security unit. To support her claim that training for issuance officers was lacking, Plaintiff cites Glasper's testimony that Ricks and another inmate "showed him what to do" when he became an issuance officer.

Supervisor liability under § 1983 is limited to cases where the supervisor is personally involved in the alleged constitutional violation, or when the supervisor's corrective inaction constitutes deliberate indifference toward the violation. *Boyd v. Knox,* 47 F.3d 966, 968 (8th Cir. 1995).[7] "The supervisor must know about the conduct and facilitate it, approve it, condone it, or

[7]If the facts do not establish an underlying constitutional violation by a subordinate, a supervisor cannot be held individually liable under § 1983. For reasons previously explained,

turn a blind eye for fear of what he or she might see." *Id*. Additionally, a supervisory officer is entitled to qualified immunity for failure to train or supervise unless a reasonable supervisor would have known that his conduct was likely to result in the specific constitutional violation at issue. *See Parrish v. Ball*, 594 F.3d 993, 1002 (8th Cir. 2010).

It is undisputed that all newly hired ADC security officers are required to attend ADC's training academy. Defendant Glasper's initial training at the academy lasted six weeks and included on-the-job and classroom training on subjects that included interaction with inmates, security and control, and managing segregated inmates. *See* Defs.' St. Facts, ¶¶8-10. In addition to initial training at the academy, ADC officers are required to acquire additional training each year, and during the relevant time period, officers were required to acquire 40 hours of additional training. *See* Norris Aff., docket entry #31, Ex. B. Defendants contend that no separate training is required for performing the job of issuance officer.

The failure to train correctional officers or the failure to implement policies and procedures aimed at preventing inmate violence may serve as a basis for liability only where the failure to act amounts to deliberate indifference to the rights of others. In order to satisfy this standard, Plaintiff must show that the need for policies, procedures, or training was so obvious and the deficiencies in these areas so likely to result in the violation of constitutional rights, that the separate defendants can be reasonably charged with deliberate indifference to the risk of harm to inmates. Here, the record is simply void of evidence that Williams, Banks, Harmon, or Norris had the requisite knowledge or drew the necessary inferences to support a claim of

---

the pre-trial record in this case does not establish an underlying constitutional violation. However, for the purpose of summary judgment review, the Court will assume that such is the case.

deliberate indifference.[8]

"The Supreme Court has generously construed qualified immunity protection to shield 'all but the plainly incompetent or those who knowingly violate the law.'" *Davis v. Hall*, 375 F.3d 703. 711-12 (8th Cir 2004)(quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092 (1986)). Interpreting the record in a light most favorable to Plaintiff, the Court cannot say that the separate defendants fall into either category.

**III.**

For the reasons stated, Defendants' motion for summary judgment is GRANTED. Pursuant to the judgment entered together with this order, Plaintiff's claims brought pursuant to 42 U.S.C. § 1983 are DISMISSED WITH PREJUDICE. Further, because the Court will dismiss all claims over which this Court has original jurisdiction, the Court will dismiss Plaintiff's supplemental state-law claims for wrongful death without prejudice. *See* 28 U.S.C. § 1367(c)(3).

IT IS SO ORDERED THIS 11TH DAY OF JUNE, 2010.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE

---

[8]Plaintiff alleges that Defendants Williams, Banks, and Harmon signed off on an enemy alert form prepared by Defendant Jackson, but she provides no evidence that these defendants were aware that Ricks was assigned to deliver items to inmates in Green's cell block. Furthermore, Williams testifies that he has no recollection of viewing an enemy alert regarding Ricks or Green and that prior to Ricks' death, he had no knowledge that Green was on Ricks' enemy alert list. Williams Dep. (docket entry #31, Ex. J) at 15. According to Williams, if Ricks had complained that he feared inmate Green, Williams would have contacted the deputy warden in the maximum security unit and ordered that Ricks be reassigned to a different job. Williams Dep. at 17-18, 48. Likewise, Defendant Harmon testifies that he was unaware of any problems between Green and Ricks prior to Ricks' death. *See* Harmon Aff., docket entry #31, Ex. I, ¶9.